UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

NOSLEN SENDRA GONZALEZ,

      Petitioner,

    v.

WARDEN OF ALLIGATOR
ALCATRAZ, IN HIS OFFICIAL
CAPACITY;  MIAMI ICE FIELD
OFFICE DIRECTOR, IN HER
OFFICIAL CAPACITY; AND
SECRETARY, DEPARTMENT OF
HOMELAND SECURITY, IN HER
OFFICIAL CAPACITY,

      Respondents.

Case No. 2:26-cv-274-KCD-NPM

## **ORDER**

Petitioner Noslen Sendra Gonzalez, a Cuban citizen, has lived in the United States since 2015. For the last ten years, he has been free on an order of supervision—a kind of immigration parole where he checks in periodically but otherwise lives his life. That changed on November 12, 2025, when the Government revoked Gonzalez's supervision and took him back into custody. He has now filed a habeas corpus petition to challenge that confinement, seeking release. (Doc. 6.)[1]

---

[1] Unless otherwise indicated, all internal quotation marks, citations, case history, and alterations have been omitted in this and later citations.

Gonzalez mounts a multi-pronged attack. First, he argues that the Government violated the Fifth Amendment's Due Process Clause by revoking his liberty without prior notice, an explanation, or a meaningful opportunity to be heard. Second, he invokes the *Accardi* doctrine, contending that his detention is unlawful because Immigration and Customs Enforcement ("ICE") completely ignored its own binding regulations governing the revocation of release. Finally, he asserts that his detention violates the Immigration and Nationality Act ("INA") because the state-run facility holding him lacks the proper statutory authority and federal contracts to operate as an immigration detention center. (*See* Doc. 6.)

The Government contends that it did exactly what the law permits. (Doc. 9.) By revoking Gonzalez's release to enforce a final removal order, the agency satisfied both its own regulations and the Constitution's due process demands. (*Id.*) For the reasons below, Gonzalez has failed to show that his return to custody is unlawful. His habeas petition thus fails.

## I. Legal Framework

The federal habeas statute, 28 U.S.C. § 2241, provides authority to issue writs of habeas corpus when an individual is "[i]n custody in violation of the Constitution or laws or treaties of the United States." *Id.* § 2241(c)(3). "At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its

2

protections have been strongest." *I.N.S. v. St. Cyr*, 533 U.S. 289, 301 (2001). "Section 2241 authorizes federal courts to hear challenges to immigration detention." *Grigorian v. Bondi*, No. 25-CV-22914-RAR, 2025 WL 2604573, at *2 (S.D. Fla. Sept. 9, 2025).

## II. Discussion

### A. Jurisdiction

The analysis begins with a jurisdictional challenge. Respondents argue that 8 U.S.C. § 1252(g) strips this Court of jurisdiction to even hear Gonzalez's plea because it arises from the "execution" of a removal order. (Doc. 9 at 4.) We need not spend long here. The Supreme Court has repeatedly cautioned that § 1252(g) is narrowly tailored to three discrete actions, and it does not operate as a blanket ban on habeas review for prolonged detention. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 841 (2018). Indeed, if the Government's sweeping interpretation were correct, *Zadvydas*—the seminal case where the Supreme Court held it could consider a habeas challenge to unlawful, prolonged immigration detention—would have been stopped in its tracks before ever reaching the merits. The Court is satisfied it has jurisdiction to decide whether Gonzalez's detention is lawful. *Zadvydas*, 533 U.S. at 688 (citing § 1252(g) yet concluding "that § 2241 habeas corpus proceedings remain available as a forum for statutory and constitutional challenges to post-removal-period detention").

3

Respondents also claim that 8 U.S.C. § 1252(b)(9) bars judicial review. (Doc. 9 at 7.) Not so. The Eleventh Circuit has held that § 1252(b)(9) "only affects cases that involve[] review of an order of removal." *Canal A Media Holding, LLC v. United States Citizenship & Immigr. Servs.*, 964 F.3d 1250, 1257 (11th Cir. 2020). Gonzalez is not challenging his removal proceedings—he is challenging the antecedent detention. So "the Government's reliance on § 1252(b)(9) is misplaced." *Fernandez-Garcia v. U.S. Att'y Gen.*, No. 1-20-CV-23599-UU, 2021 WL 8821923, at *5 (S.D. Fla. Apr. 15, 2021). Gonzalez's substantive claims are addressed in turn below.

**B. Substantive Due Process (Count I)**

The Fifth Amendment entitles noncitizens to due process during deportation proceedings. At the same time, however, "detention during deportation proceedings [is] a constitutionally valid aspect of the deportation process." *Demore v. Kim*, 538 U.S. 510, 523 (2003). "[T]he through line of history is recognition of the Government's sovereign authority to set the terms governing the admission and exclusion of noncitizens." *Dep't of State v. Munoz*, 602 U.S. 899, 911-12 (2024). "In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." *Mathews v. Diaz*, 426 U.S. 67, 79-80 (1976).

Because immigration detention is a civil tool rather than a criminal penalty, the constitutional line is generally drawn at punishment. *See Rodriguez-Fernandez v. Wilkinson*, 654 F.2d 1382, 1387 (10th Cir. 1981). By contrast, the Government can lawfully hold a noncitizen to ensure they are present for removal or to keep the public safe. That is simply the machinery of the immigration system doing its job. A substantive due process violation happens only when that machinery breaks down—when the detention loses its reasonable connection to effectuating a removal order and morphs into a penalty. *Cf. Lee v. Stone*, No. 2:11-CV-00014-RWS, 2011 WL 4553147, at \*7 (N.D. Ga. Aug. 25, 2011). So long as the custody serves a legitimate immigration purpose rather than acting as a punitive measure, it stays on the right side of the Constitution. *See, e.g.*, *United States v. Salerno*, 481 U.S. 739, 747 (1987); *Rodriguez v. Perry*, 747 F. Supp. 3d 911, 917 (E.D. Va. 2024) ("[A]liens . . . have a substantive due process right to be free of arbitrary confinement pending deportation proceedings.").

Gonzalez cannot show that his current stint in custody is a punishment masquerading as immigration processing or is otherwise arbitrary. He is subject to a final removal order that stands uncontested. The INA explicitly authorizes a return to detention to effectuate such orders. Under the rules, ICE may revoke a noncitizen's release to effectuate removal. 8 C.F.R. § 241.13(i)(2). And the government no doubt has a legitimate interest in doing

exactly that—enforcing its laws, ensuring individuals do not flee, and protecting the public. *See Malam v. Adducci*, 469 F. Supp. 3d 767, 790 (E.D. Mich. 2020). Here, the Government revoked Gonzalez's release specifically to enforce his outstanding removal order. Returning him to custody thus serves a recognized, legitimate government objective.

Nor are we anywhere near the constitutional danger zone. ICE re-detained Gonzalez on November 12, 2025. He has been in custody for nearly five months. That is a far cry from the indefinite, limbo-like detention that the Supreme Court has rejected under the Fifth Amendment. *See Zadvydas v. Davis*, 533 U.S. 678 (2001). Instead, it falls well within the six-month window the *Zadvydas* Court deemed presumptively reasonable to carry out a deportation. *Id.* at 701 (holding that executive agencies may not hold noncitizens longer than six months when removal is not foreseeable and stating, "[a]fter this 6-month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing").

Gonzalez claims that his removal is not likely in the foreseeable future. (Doc. 6 ¶ 74.) But this argument puts the cart before the horse. Until the six-month *Zadvydas* period concludes, his detention is presumptively reasonable, and any due process claim is not ripe. *See, e.g., Grigorian v. Bondi*, Case No.

6

25-CV-22914-RAR, 2025 WL 1895479, at *8 (S.D. Fla. July 8, 2025); *Lopez v. Dir. of Enf't and Removal Operations*, Case No. 3:25-cv-1313-JEP-SJH, 2026 WL 261938, at *12 (M.D. Fla. Jan. 26, 2026); *Guerra-Castro v. Parra*, Case No. 25-cv-22487-GAYLES, 2025 WL 1984300 at *4 (S.D. Fla. July 17, 2025) (finding habeas petition "premature" because "Petitioner has not been detained for more than six months").

Apparently recognizing this temporal hurdle, Gonzalez attempts a workaround. He argues that the six-month reasonable detention period is cumulative, starting when his supervision began. (Doc. 13 at 4.) Gonzalez was released from mandatory detention back in 2016, which means the six-month period has long since passed.

This argument makes little sense. *Zadvydas* was aimed at the severe, physical deprivation of liberty that comes from sitting in a jail cell indefinitely. The Court "used the words 'detain' and 'custody' to refer exclusively to physical confinement and restraint." *Jennings*, 583 U.S. at 311. Against that backdrop, it is illogical to run a clock designed to prevent indefinite imprisonment while a person is out living freely in the community. "Because *Zadvydas* clearly involved *detention* of a petitioner during the presumptively reasonable period, it defies common sense to suggest that *Zadvydas* time can run while a petitioner is not in custody." *Cheng Ke Chen v. Holder*, 783 F. Supp. 2d 1183, 1192 (N.D. Ala. 2011). The six-month clock

7

measures actual lockup, not supervised freedom. *See Akinwale*, 287 F.3d at 1052 ("[I]n order to state a claim under *Zadvydas* the alien ... must show post-removal order *detention* in excess of six months [and] also must provide evidence of a good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." (emphasis added).)

Gonzalez also seeks to sidestep the six-month requirement by pointing to earlier periods of detention, arguing that the Court should aggregate his past and present stints in ICE custody. (Doc. 13 at 3.) By combining these distinct periods of confinement, Gonzalez contends that his total time in civil immigration detention exceeds the six-month threshold, which he asserts is sufficient to rebut the presumption of reasonableness and trigger the *Zadvydas* review.

District courts are split on whether prior time in ICE custody should be aggregated to satisfy the six-month *Zadvydas* clock. Some have firmly rejected this cumulative approach. They reason that if "detentions [are counted] in the aggregate, any subsequent period of detention, even one day, would raise constitutional concerns." *Barrios v. Ripa*, No. 1:25-CV-22644, 2025 WL 2280485, at *8 (S.D. Fla. Aug. 8, 2025). Because the executive branch is tasked with great deference in effectuating removals, these courts warn that constantly adjudicating the constitutionality of every brief re-detention would improperly obstruct that statutory discretion. *Meskini v.*

8

*Att'y Gen. of U.S.*, No. 4:14-CV-42 (CDL), 2018 WL 1321576, at *3 (M.D. Ga. Mar. 14, 2018). Under this view, *Zadvydas* does not function as a "Get Out of Jail Free Card that may be redeemed at any time just because an alien was detained too long in the past." *Id.*; *see also Flores-Reyes v. Assistant Field Off. Dir.*, No. 26-CV-20226, 2026 WL 406708, at *2 (S.D. Fla. Feb. 13, 2026).

Conversely, other courts have treated the *Zadvydas* period as cumulative. *Chen v. Holder*, No. CV 6:14-2530, 2015 WL 13236635, at *2 (W.D. La. Nov. 20, 2015). This approach is driven by the constitutional imperative to prevent the government from indefinitely detaining noncitizens through a loophole of release and re-detention. *Krechmar v. Parra*, No. 2:25-CV-01095-SPC-DNF, 2025 WL 3620802, at *3 (M.D. Fla. Dec. 15, 2025). To consider only the current, isolated period of confinement—ignoring all prior custody—would allow the government to bypass *Zadvydas* through successive detentions. For these courts, aggregation is the only way to safeguard against the precise danger of indefinite detention that the Supreme Court sought to prevent. *See Rodriguez Romero v. Ladwig*, No. CV 25-1106-JWD-EWD, 2026 WL 321437, at *12 (M.D. La. Feb. 6, 2026).

This Court declines to endorse a blanket rule that all prior periods of confinement automatically aggregate to satisfy the *Zadvydas* six-month clock. Such a categorical approach is practically unworkable and effectively penalizes the government for its past lawful actions. If every prior day spent

9

in immigration custody simply rolled over into the present calculus, the government's statutory authority to briefly re-detain a noncitizen to finalize a removal would be severely restricted, if not eliminated entirely. The six-month period established in *Zadvydas* was designed to provide the government a functional window to negotiate with foreign nations, secure travel documents, and coordinate the complex logistics of deportation. A strict aggregation rule ignores the reality that diplomatic circumstances evolve. If a foreign government that previously refused repatriation suddenly agrees to issue travel documents, the United States needs a practical opportunity to effectuate that newly viable removal. Mandating an automatic rollover of all past detention would force the immediate release of a noncitizen even when their current custody is driven by an imminent, foreseeable deportation, ultimately frustrating the core purpose of the removal statute.

Instead, the better approach is to afford the government a new six-month presumptively reasonable period for each discrete detention, unless there are facts suggesting the government is acting with an improper motive. If the record reveals a calculated pattern of catch-and-release designed merely to reset the *Zadvydas* clock or evade judicial review, aggregation may be entirely appropriate. But absent evidence of such bad faith or a deliberate strategy of looping confinement, courts should presume that a subsequent detention is a genuine, independent effort to effectuate removal. This

standard strikes the appropriate balance. It alleviates constitutional concerns regarding indefinite, cyclical detention by providing a safeguard against abuse, while simultaneously protecting the government's legitimate, statutory interest in finalizing deportations when logistical or diplomatic circumstances finally permit.

This approach finds support in both *Zadvydas*'s reasoning and the historical foundations of the vehicle Gonzalez employs (habeas corpus). In *Zadvydas*, the Supreme Court eschewed a rigid, mechanical formula, focusing instead on whether the length of detention remains "reasonably necessary to secure removal." 533 U.S. at 699. The Court explicitly instructed lower courts to measure reasonableness in light of the specific circumstances of the case and the actual likelihood of a future deportation. *Id.* ("It should measure reasonableness primarily in terms of the statute's basic purpose, namely, assuring the alien's presence at the moment of removal."). That directive undermines the logic of a blind, automatic aggregation of prior custody days here. *See also Meskini*, 2018 WL 1321576, at *3.

A flexible standard also aligns with the fundamental principle that habeas corpus is "at its core, an equitable remedy." *Munaf v. Geren*, 553 U.S. 674, 693 (2008). Because habeas relief is governed by equitable principles, courts are empowered to look beyond a mere mathematical tally to examine the totality of the circumstances. *Id.*; *see also Duckworth v. Eagan*, 492 U.S.

11

195, 213 (1989) (O'Connor, J., concurring) ("[T]he Court has long recognized that habeas corpus [is] . . . governed by equitable principles[.]"). By inquiring into whether the government has engaged in a deliberate cycle of release and re-detention, the court exercises its equitable discretion to prevent gamesmanship, all while preserving the executive branch's necessary flexibility to enforce the immigration laws.

Applying this standard here, Gonzalez's argument for aggregation falls short. While he points to his prior period of ICE custody, the record is devoid of evidence that immigration officials manipulated his release and rearrest to bypass the six-month presumption or avoid judicial oversight. Without proof of such tactical maneuvering, this Court treats his present custody as an independent, good-faith endeavor to secure his deportation.

As the Supreme Court has long recognized, "detention during deportation proceedings [is] a constitutionally valid aspect of the deportation process." *Demore*, 538 U.S. at 523. So the executive branch gets a presumptively reasonable six-month runway to do its job, negotiate with foreign governments, and execute a final removal order. *Zadvydas*, 533 U.S. at 701. Because Gonzalez remains inside that window, his current custody does not cross the line into the kind of indefinite, arbitrary lockup the Fifth Amendment forbids. Until that clock actually runs out, the Government retains the constitutional authority to hold him.

## C. Procedural Due Process (Count II)

For starters, it's not entirely clear that Gonzalez is entitled to a freestanding due process analysis at this time. When the Supreme Court confronted the constitutional perils of indefinite immigration detention in *Zadvydas*, it did not instruct lower courts to start weighing the process afforded to the detainee. It set a timer. For the first six months, detention is presumptively reasonable. *Zadvydas*, 533 U.S. at 701. So until that timer goes off, *Zadvydas* itself seemingly supplies the constitutional metric. *Martinez v. Larose*, 968 F.3d 555, 566 (6th Cir. 2020). "In other words, the *Zadvydas* standard *is* due process: a § 1231 detainee who fails the *Zadvydas* test fails to prove a due process violation." *Castaneda v. Perry*, 95 F.4th 750, 760 (4th Cir. 2024). Because Gonzalez's detention is barely out of the starting gate, he is presumably not yet entitled to anything more.

But even if we assume the due process clause applies with full force, Gonzalez still comes up empty. His claims boil down to a familiar grievance: the Government ignored its own regulations. (Doc. 6 ¶ 77.) He alleges that ICE locked him back up without providing the required notice or an interview after his return to custody. (*Id.*) He also claims that his revocation is void because the official who signed the paperwork lacked the authority to do so. (*Id.* ¶ 80.) By ignoring the agency's rulebook, the logic goes, the Government short-circuited his constitutional rights. (*Id.*)

13

At its core, the Due Process Clause demands that before the government strips a person of a protected liberty interest, it must provide notice and a meaningful opportunity to be heard. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). "Due process requires notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 272 (2010).

In the context of revoking a noncitizen's supervised release, ICE's regulations strike that constitutional balance by guaranteeing written notice and an informal interview that allows the individual to respond. *See* 8 C.F.R. §§ 241.4(l)(1), 241.13(i). Gonzalez received both a notice of revocation and an informal interview. (Doc. 9-4.) For purposes of the Fifth Amendment, the process he received clears the bar. Due process is not a rigid straitjacket. It requires only that the Government provide fair notice and a meaningful opportunity to be heard. *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). By handing Gonzalez a written notice that identified the agency's decision and sitting him down for an interview to present rebuttal evidence, ICE gave him exactly that. The Court can find no procedural due process violation here.

14

## D. Accardi Doctrine (Count III)

Gonzalez does not rely on the Constitution alone. He also brings a claim under the *Accardi* doctrine. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954). The premise of that doctrine is straightforward: "an agency must abide by its own regulations." *Chevron Oil Co. v. Andrus*, 588 F.2d 1383, 1386 (5th Cir. 1979). "[A]gency deviation from its own regulations and procedures may justify judicial relief in a case otherwise properly before the court." *Jean v. Nelson*, 727 F.2d 957, 976 (11th Cir. 1984). And it "goes without saying that ICE, like all government agencies, must follow its own regulations." *Roble v. Bondi*, 803 F. Supp. 3d 766, 774 (D. Minn. 2025).

Because it appears the Government previously released Gonzalez after determining that there was no significant likelihood of his removal (Doc. 9-4), the regulation governing his return to custody here is 8 C.F.R. § 241.13(i). *See Choy v. Woosley*, No. 4:25-CV-197-DJH, 2026 WL 324601, at *3 (W.D. Ky. Feb. 6, 2026). It provides the precise steps ICE must take before re-arresting someone based on a renewed likelihood of removal. *Id.* § 241.13(i).

Gonzalez claims that ICE ignored those mandatory procedures entirely. He allegedly received "no written explanation, no finding of violation, and no procedural steps whatsoever before cancelling his supervision and taking him into custody." (Doc. 6 ¶ 85.). Under *Accardi*, he concludes, that complete

15

regulatory bypass renders his ongoing detention legally defective and unlawful.

Gonzalez's contention that he received no written notice is a nonstarter. When officers took him into custody, he was provided a "Warning to Alien Ordered Removed or Deported" (Doc. 9-1 at 3) and a Notice of Revocation of Release later in February 2026 (Doc. 9-4 at 3). And these pieces of paper told him exactly why he was losing his liberty: there is a significant likelihood of removal in the reasonably foreseeable future. (*Id.*) That is a written explanation. It may not have been the extensive memorandum Gonzalez would have preferred, but it was more than enough to put him on notice of the Government's basic rationale for bringing him back into custody. Nothing more was needed to satisfy § 241.13(i). *See Tran v. Warden, S. Side Det. Ctr.*, No. 2:25-CV-1224-KCD-NPM, 2026 WL 672969, at \*8-9 (M.D. Fla. Mar. 10 2026).

Turning next to Gonzalez's claim that the notice had "no finding of [a] violation," that argument misses the mark for a different reason. (Doc. 6 ¶ 85.) He seemingly insists that ICE could not revoke his supervision because he never broke the rules. But the applicable regulation simply does not require a rulebook infraction to haul someone back into custody. Under 8 C.F.R. § 241.13(i)(2), the government can revoke release based on changed circumstances alone—specifically, when there is a "significant likelihood that

16

the alien may be removed in the reasonably foreseeable future." *Id.* Playing by the rules is commendable, but it does not buy a noncitizen permanent immunity from a final, executable deportation order.

Gonzalez similarly complains that the Government took "no procedural steps whatsoever before cancelling his supervision and taking him into custody." (Doc. 6 ¶ 85.) If he means ICE was required to provide process *before* putting him in handcuffs, he is misreading the text. Section 241.13(i) does not mandate a pre-deprivation process. It allows the agency to revoke a release order and detain an individual based on changed circumstances without first convening a panel or holding a hearing. *See* 8 C.F.R. § 241.13(i)(3) ("The Service will conduct an initial informal interview promptly *after* his or her return to Service custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification." (emphasis added).) And to the extent Gonzalez challenges the timing of the notice and interview, any delay has been remedied. Because the required process has now occurred, any procedural delay does not provide a basis for backward-looking relief in a habeas proceeding. *See Nguyen v. Noem*, 797 F. Supp. 3d 651, 670 (N.D. Tex. 2025). A writ of habeas corpus is a forward-looking remedy intended to secure release from unlawful custody; it is not a vehicle for redressing past procedural errors that no longer affect the current

17

lawfulness of a petitioner's detention. *See, e.g.*, *Zhen v. Doe*, No. 3:25-CV-01507-PAB, 2025 WL 2258586, at *10 (N.D. Ohio Aug. 7, 2025).

Gonzalez lastly complains that under 8 C.F.R. §§ 241.3 or 241.4, Respondents failed to provide "a duly executed notice signed by the proper official." (Doc. 6 ¶ 80.) He insists this technicality voids the entire revocation. *See* 8 C.F.R. § 241.4(l)(2); *cf. Ceesay v. Kurzdorfer*, 781 F. Supp. 3d 137, 160 (W.D.N.Y. 2025) ("[U]nder § 241.4(l)(2), the officials with the power to revoke release after making certain findings include field office directors and any other officials delegated the function or authority ... for a particular geographic district, region, or area.").

But there is a fundamental problem with this point: Gonzalez is reading the wrong regulation. He was originally released back in 2016 because his removal to Cuba was not reasonably foreseeable. That puts his case on a different regulatory track, one governed by 8 C.F.R. § 241.13. When the Government decides it is time to again detain someone on that specific track, it must follow the revocation procedures from § 241.13. *See Choy*, 2026 WL 324601, at *3.

Section 241.13 contains no rigid signature requirement limiting revocation authority to field office directors or other specific high-ranking officials. It simply says the agency can revoke an order of supervision if changed circumstances mean removal is now significantly likely. Gonzalez

18

never identifies how the Government failed to comply with the regulations or who should have signed the revocation notice. *See Blankenship v. Hall*, 542 F.3d 1253, 1270 (11th Cir. 2008) ("It is the petitioner's burden to establish his right to habeas relief and he must prove all facts necessary to show a constitutional violation."). Gonzalez has not shown an *Accardi* violation.

### E. Counts IV & V—No Authority to Detain[2]

In his final claims, Gonzalez shifts focus from the process of his detention to the place of his detention. He takes aim at the facility where he was housed—Alligator Alcatraz—arguing that it operates outside the bounds of the law. (Doc. 6 at 25-26.)

These claims can be disposed of quickly. Even if he is right, and Alligator Alcatraz is operating in clear violation of the law, that fact would not entitle him to the relief he wants—release from ICE custody. A challenge to the conditions of confinement does not suddenly invalidate the legal basis for that confinement. If a detention center is sub-par or operated unlawfully, the proper judicial remedy is to order the government to fix the facility or to transfer the detainee to one that passes muster. The Court declines to use a facility defect as an excuse to simply unlock the gates and let an individual with a final, executable removal order walk free.

---

[2] The petition inadvertently labels both of its final two claims as "Count IV." (Doc. 6 at 25.) For clarity and ease of reference, the Court refers to the final claim regarding 8 U.S.C. § 1103(a)(11)(A) as Count V.

19

**\* \* \* \***

In the final pages of his petition, Gonzalez tacks on two more requests for relief that seem to come out of nowhere. First, he asks for notice and a hearing to oppose removal to an "alternative third country," just in case the Government identifies one. (Doc. 6 at 26.) Second, he asks for a sweeping injunction to stop the Government from re-arresting him in the future, absent strict compliance with federal law. (*Id.*)

Neither request gets off the ground. To begin with, they are seemingly untethered from the petition itself. A prayer for relief is not a place to smuggle in standalone demands, and neither of these requests appears tied to an actual, substantive claim argued in his briefing.

More fundamentally, both requests deal in pure hypotheticals. They ask the Court to solve problems that do not actually exist. "Federal courts cannot adjudicate . . . abstract disputes, or exercise general legal oversight of the Legislative and Executive Branches." *Coker v. Austin*, 688 F. Supp. 3d 1116, 1121 (N.D. Fla. 2023). Gonzalez has not alleged that the Government denied him the opportunity to contest his removal to a third country. Similarly, he is currently sitting in custody, not living freely in the community bracing for a future, legally deficient re-arrest. Because these requests ask the Court to shadowbox with hypotheticals, they warrant no relief.

### III. Conclusion

Gonzalez has not established that his current detention is unlawful. But he may return to challenge his revocation if his continued detention becomes unconstitutionally prolonged. Accordingly, the Amended Petition for Writ of Habeas Corpus (Doc. 6) is **DENIED WITHOUT PREJUDICE**. The Clerk of Court is **DIRECTED** to enter judgment, deny any pending motions as moot, and close this case.

**ORDERED** in Fort Myers, Florida on March 30, 2026.

Kyle C. Dudek
United States District Judge